argument case number 20-2964 Victor Paredes Gonzales et al versus Merrick B. Garland. All right I can see Mr. Wilson. I cannot see Mr. I cannot see counsel for the government. I'm here your honor. All right we can hear you but my camera is taking its time to come on. All right we'll wait a minute for that then. Yes your honor my camera is taking its time to come on. Mr. Wilson you may proceed. Thank you your honor. May it please the court my name is David Wilson. I'm appearing on behalf of all three petitioners in this matter collectively identified as the Paredes brothers. The matter before the court is a single issue which is whether the agency incorrectly denied the petitioner's application for relief under article 3 of the convention against torture. As the government had noted in its briefing we did not seek review of the initial asylum or withholding removal claims. We recognize the state of the case law and the burden that we have before this court and opted not to appeal those particular issues. In considering the question before the court today then it needs to be understood in the context of the decisions from the agency at this point. Page 44 of the immigration judge's order buries in a clause a particular fact that's relevant to the disposition of this case. The judge in that case recognized that human rights including among human right issues included among other things reports of unlawful arbitrary killings and torture by government officials and then she has a string cite to various reports. In fact what the department of state has found over a course of many years is that Bolivia and its law enforcement actors engages in active torture. There is legislation in Bolivia that prevents them from doing that but it nevertheless has been documented time and time again that it happens. It happens in the form of sensory deprivation, improvised tear gas chambers, tasers, asphyxiation, verbal abuse, and threats of violence. There are also reports of penal institution employees using sexual assaults and sexual violence against inmates who are detained. That's relevant because it would be very easy to get caught up in the summation that the board provides which is that under general country conditions there is no claim but this is more than just general country conditions. This is the department of state actually finding for the benefit of this court and for this record that torture actually does and is used pervasively in Bolivia and that's against the backdrop of rampant corruption amongst law enforcement and the judiciary there. The Bolivian court system is considered one of the least respected institutions in the world. It's the only supreme court that actually has elected officials and corruption is rampant at all levels of government. It's against that record shows that the petitioners have proven that they're more likely not to suffer torture. Now before the immigration judge and the agency, the petitioners had maintained that there are two sets of actors that are at issue here. There's the investors as group one but then it's also the people who are responsible for their confinement and during in the briefing the government suggests that it's only potential custody. There is no potential here. The government's exhibits show that the Bolivian government has always maintained that they intend to take the individuals into custody upon return to Bolivia. This isn't the case where an individual might arrive at the airport, slip out into a car and then be able to hide for some time against a government actor who might have a personal agenda against that person and hopes to use their office to perfect it. This is the unique case where you have a robust specific law enforcement response these individuals and documented intention that's as far as going as having a warrant, a complaint. You've got interpol red notices being used in efforts to reach out and secure these particular petitioners. You even have individuals traveling to the United States to seek them out in order to identify where they are and helping individuals, laymen who are living in the United States, coordinating to help them come to ICE locally to find out where these Bolivian government is undeniable. That's important because IJ's analysis focused on the individuals who the petitioners had identified as their persecutors relevant for asylum purposes. But that is not the only question. CAT refers to the future. It's will someone be tortured, not have they been tortured. The analysis from the immigration judge speaks so much to the past. It does not actually take into account what happens when a person enters the penal institution in Bolivia and are they likely to be tortured. The record from the courtesy of the Department of State says yes, very much so. Mr. Wilson, what other than you've got the State Department records and I think there was some testimony about another partner that had returned and was in prison, but there's not a lot of detail from those who might know most specifically and personally what's happening with him, was there? There was no direct contribution from Luis's family. The individual is identified as Luis. He's one of the five partners or owners of the company at issue here, TR Dulce. There were only basically I would say a string of hearsay coming from Luis's relatives and to the petitioner's relative then getting to the United States. The fact of the matter is no one has direct access with this individual because he was incarcerated this whole time. But the lay witnesses, the ones the government actually called, the two witnesses who were investors, they too identified that Luis was in custody and he had been since 2015. So by the time of the hearing, he had already been in custody for over four years, if not four and a half years. Bolivian law puts a cap on pre-trial detention. It says 36 months, but the country conditions and the particular experience of this individual who's connected with this case shows that that standard has no meaning. Detention can go on indefinitely. The country condition evidence actually shows that for pre-trial detention purposes itself, often the person spends more time in custody for pre-trial detention than they would for their actual sentence if they were just convicted of the crime in the first place. And moreover, pre-trial detention is used rampantly in Bolivia. It's used as a way of method of coercing someone for particular outcome. It's used by political opponents against each other. I think it's well known that the president who was in power for a short period is now in custody six days after there was a change in government. She's now in pre-trial detention for alleged political crimes. Mr. Wilson, is it the extended nature of the custody that you're saying is the torture? I'm arguing, Your Honor, that it is a form of torture that when a person is subject to extreme conditions for an indefinite time period, that in itself can be torture. But we are not making the mistake of arguing that the conditions in general, an impoverished penal system, is in itself a form of torture. We recognize the case law that recognizes that if a jail is in shoddy conditions simply because the country does not invest in its jail system and ensure a certain quality of life or standard of care, that's a generalized concern. And that is excluded from CAT. CAT does require specificity to the individuals. But Bolivia is the equivalent of detention plus. The records, independent of the petitioner's testimony, shows that these individuals, in fact, that there is a propensity to use torture liberally. And there's documented cases from third parties who have no interest in this case. And the various types of behavior, engagement, or conduct undoubtedly would qualify as torture, asphyxiation, tear gas chambers, sexual assaults that are done purposefully. Based on your argument, would it be that anyone who was being extradited back to Bolivia, whether it's your client or your clients or anyone else, would be subject to torture? Because it is a general argument. That is correct, Your Honor. It is a rather general argument. But there's the case of Khartoum when you look at the pattern of Egypt in the same pattern where individuals are routinely, when returned, are immediately handed over to police and then torture is used to force confessions. So in that situation, you have the same pattern that you're identifying. I believe that in Bolivia, the risk is the same. That if an individual, that the government has zeroed in on someone and used its authority to concoct a prosecution or maybe a legitimate prosecution, but they have shown that they will use torture to extract confessions. There are moments within this record where there are suggestions that Luis, for example, is now a cooperative witness. But it begs the question, well, how does after five years he say anything to get out of custody? That's just a common understanding of what the crucible of custody and physical and sexual abuse will do to someone. And so against this issue, the IJ had said that there was no color of lock or official capacity. I don't know how that's possible to reach that conclusion and the agency validated it, but it's very clear from the government's own exhibits where these individuals are headed. There's this warrant, there's an interpol notice, so where they're headed is right back into the hands of the government. And so the IJ specifically talked about interactions in a public space. That's irrelevant for CAT. It wasn't what happened in the past. Persecution is irrelevant to whether there's going to be torture, but it's not relevant for the question of color of law. For color of law, the question is, are they going to be in jail? Counsel, has any court adopted this rule that you're advocating with respect to Bolivia? This general rule that anyone being returned to Bolivia is entitled to face criminal prosecution, is entitled to convention against torture relief? No, and I should caution that I'm not suggesting that the idea of an extradition per se would actually do that, because there is the caveat within CAT that if it is a legitimate government sanction, or in that even though the U.S. may not condone that particular sanction, but if it's done consistent with law, then it may not actually arise to an action. There is a 2017 case, I believe out of the 11th circuit, that touches upon a similar scenario. The difference there in that record, though, is that case did not have the same underpinnings to show where the person was going, or the investment of the Bolivian government in the individual, so that record didn't go as far as this one. Where here, you actually have the specifics of the judicial process at play, or at issue, already in Bolivia, to giving the context to the claims. In other words, it's not speculative that Bolivia may do this. They may take an interest in that person upon their return. In this particular instance, it's assured. Bolivia has shown their intentions. I see I've already exhausted my time, so I'll reserve the remainder. Thank you. Very well, you may do so. Thank you for your argument. We still can't see counsel for the government. Was this tested beforehand, Ms. Smith? Yes, it was. In fact, we tested twice. I'm not sure what's happening today. Yes, well that's par for the course. We appreciate your diligence in that regard. Ms. DeRocha-Afudu, we cannot see you, but I guess we'll hear your argument by audio only. Thank you, Your Honor. Good morning. May it please the Court, Remy DeRocha-Afudu, representing the United States Attorney General. The government's position is that this case turns on the agency's adverse credibility finding, and the Court should deny this petition based on that finding. The only question for the Court is whether any reason for adjudicating could have been found as the agency did. As the Supreme Court recently reiterated in Maine Dye, the agency's reasonable findings, supported by content reasons, may not be disturbed under the deferential standard of review. In this case, the immigration judge considered the totality of the circumstances when weighing the petitioner's credibility against all available evidence in the record, and the inherent plausibility of the petitioner's explanation. The judge identified at least 12 different areas of testimony from petitioners that raised significant concerns with their credibility. Petitioners have attempted to confuse matters by providing explanations that beg several questions and do not resolve the discrepancies in the record. For example, I'll mention one or two, Your Honor. Petitioners have not persuasively explained why they did not include Victor's alleged harms in the initial and supplemental asylum application. More perplexing, though, are the explanations given for the immigration. Victor stated that he was afraid that if he mentioned the physical assault, he and his family could be killed. How do you likewise testify that he did not include the information in his asylum application because he was afraid and he thought they did not have enough proof to do so? It's simply strange credibility, Your Honor, for petitioners to make that claim. All the way from Bolivia, so that they could state their claim, they mentioned it to the asylum officer, and asylum proceedings are confidential in nature, and petitioners did not include this pivotal piece of information in the extremely detailed affidavits submitted with their applications. This is the type of scenario that this Court contemplated in Ali V. Holder, where the Court held that the agency is entitled to rely on contradictions in the record, where the statements are difficult to reconcile, even when they seem like minutiae or seemingly have little to do with the petitioner's credibility. The same thing goes for petitioner's testimony regarding General League and Vasco, and who was the wing leader. They never mentioned League at all in their affidavits, and then all of a sudden they come up and say he was the one who was the wing leader. At the same time, they offered perplexing explanations. They didn't think that they could implicate League because they didn't have enough information in their hands to implicate League. But the same thing goes for Vasco, who they later stated was not the wing leader, but League. And then considering that League had made so many statements and petitioners had stated that he would destroy their family, he would come after them like animals, that he was a rebel leader, and he was the most aggressive in terms of threats, and that he instigated the charges against them, it didn't change credibility, Your Honor, as petitioners would state that they forgot about League, he didn't come directly into mind, or they didn't have enough evidence to say that League was the wing leader. So, based on these two findings that you know, Your Honor, the agency's average credibility findings should be upheld. As I said, Your Honor, there are a few more, there are 12 in total, also that the immigration judge outlined in the decision, and that decision usually would stand with you. Going on to Petitioner's claim that he preserved for review, Petitioners have simply not established that any of the individuals who allegedly threatened and harmed them and their family in Bolivia were public officials when those incidents occurred. Petitioners testified that General League retired from the military and that Vasco was not a public official. And based on the totality of the record, Your Honor, and Petitioner's testimonies, it is clear that most of the investors were from the military sector. They were friends, Petitioners themselves, their father was a high-ranking military official, but the fact that these government officials were the ones going after them does not mean that there is a governmental interest in this matter, aside from the issue of the prosecution, Your Honor, of their criminal case in court. And Petitioners have simply not made, you know, a conclusion in this case. They have not established, for instance, that higher-level officials would not intervene on their behalf to protect them if anything happened to them. And the immigration judge considered the contrary reports and Petitioner's experts' reports and determined that while there are reported instances of human rights violations in Bolivia, that fact alone was insufficient to show that Petitioners would be in danger of being subjected to torture. The judge properly ruled that Petitioners must show that specific grounds exist to indicate that they would be personally at risk. And they have not done so here. Instead, it points to evidence of prolonged pretrial detention and inhumane conditions as evidence that the Bolivian government intends to cause them severe harm. This court in last year actually addressed that specific issue. And it reiterated a ruling in Churchill where the court ruled that an underlying intent to cause severe harm, not simply an intent to carry out an act, but ultimately result in torture. Petitioners have not... Counsel, can you hear me?  I do. I have a question I wanted to follow up on your description of sort of general conditions within the prison. As I understand the argument, it's a little bit more than that. It's that these individuals, based on some of the evidence that was presented at the hearing, have been targeted by the government so that they are a little different than just someone going in to pretrial detention for a period of time. Can you speak to that? Yes, Your Honor. And that is part of the confusion that Petitioners have attempted to create in this case. Petitioners are not being targeted by the government. They are wanted for criminal prosecution based on the full scheme or whatever it is, where several hundreds of people were robbed of their money, close to $8 million. So in this case, Petitioner is attempting to say that the government is trying to persecute, but the key word here is prosecution, not persecution. And that is why Petitioner's partner, who leaves, who when he returns to Bolivia, was incarcerated. And his trial has moved on based on instances in the record which show that he's incorporating, that a prosecutor even dropped some of the charges leveled against him. And so Petitioner's claim that they're being targeted specifically is incorrect, Your Honor. When the ICE broke that, all three persons have been deported, Your Honor. And when they arrived, yes, they were incarcerated, but incarcerated pending the criminal charges against them. There is nothing in the record, and Petitioners have been tortured in prison. There is no corroborating evidence in the record. An immigration judge specifically made that finding. In fact, when the judge asked counsel for documentation, certain documentation, counsel responded that he had documents, but they had not been translated. And then the letters from Petitioner's mother and other and we were right in front of it. In fact, Louise's mother did not provide details about Louise's condition in prison. And so there is all speculation, Your Honor, about Louise's treatment. Petitioners have filed a motion to reopen the court. They have not alleged that Petitioners are being tortured. The fact that one is incarcerated for a lengthy period of time, especially in a country like Bolivia where the rules of justice are sore because of problems in that country, they don't have a fully developed legal system, is not torture, according to the standards in this court. And Petitioner has not. You asked the question, Your Honor, today, whether there's any court of law that has ruled that anyone going back to Bolivia that isn't, you know, taxing and automatically would, um, um, you know, should be run across, cattle would be, um, tortured. And there's just nothing in the record to support that, Your Honor. I hope I've answered your question in that regard, Your Honor. All right. Does that complete? Your Honor, can you hear me? All right. Um, well, Your Honor, in terms of the, um, um, Petitioner's casting, we would also like to note that Ivo Morales, the former president of Bolivia, um, who Petitioners had alleged, um, would use the, um, uh, reprisals of space to torture them, is no longer, uh, on precedent. There's been a radical change in the government after 13-year rule by Ivo Morales. And so, the argument that the approach of the government under the previous regime would be used to torture them is no longer valid. In the U.S., the United States has also been using consular relations with Bolivia, and, um, the United States is helping that country to institute reforms. Um, so there really is no, um, there's nothing in the record other than conjecture, Your Honor, to show that, um, Petitioners will be tortured in Bolivia. But again, um, the government would like to reiterate, Your Honor, that this case turns on the agency's credibility ruling, and we have had the Supreme Court's recent decision in Mundi, holding that the agency's reasonable findings, so court-of-acquaintance reasons may not be disturbed. Um, that's a highly deferential standard of review. And so, accordingly, Your Honor, we would ask that the court deny the petition for review. All right, thank you. If I may, Your Honor, also talk about the Interpol Red Notice. Yes, you may. You have time remaining. Yes, the Interpol Red Notice, Petitioners have alleged that that played a major role in the agency's decision. Um, Your Honor, the record shows that the agency itself stated that it did not rely on the Interpol Red Notices, um, on pages 536 to 59 of the, um, record. Um, and we mentioned the Red Notices in response to Petitioner's, um, argument that she should not rely on it. And so, we'll stand on our, based on our motion on that particular issue. Thank you very much, Your Honor. And I'm sorry that the video didn't come up. Yes, we wish you luck in improving your video capability, and, uh, you might check your audio as well, because it was not ideal, but we heard your argument, and thank you for appearing. Mr. Wilson, we'll hear from you in rebuttal. All right, thank you, Your Honor. I'll just know for the record that... Thank you, Your Honor. Oh, sorry, I didn't realize Counsel was not done speaking. I'll just know initially for the record that the discussions about Mr. Morales, um, and introducing him to the record, um, is not doing service to this court. Um, it's a moving target. Um, you know, the political condition in Bolivia is changing. Mr. Morales, in fact, is back in the court as the immigration judge, um, and that's part of our, you know, pending motion we opened with the, with the board is that the conditions have changed in that regard. Um, so I, I will note that, well, the government's argument essentially is focus on credibility and ignore the rest. Um, and to that extent, I will say the credibility finding is limited to the extent that the court actually, the immigration judge and the agency considered who might be the actor relative to the question of torture. Um, if it, in the order of the immigration judge, it's very clear that she's not considering the penal institution, the law enforcement officer, judicial officers as a whole, or in, in their respective roles. She's only considering the individuals identified, um, relative to the asylum claim. To that extent, the credibility analysis is, falls short. It doesn't actually reach the question of, on that particular point. Um, and so to the extent that the agency's only consider credibility based exclusively within the confines of asylum, um, the problem with doing that in CAT in this particular context is you have a different set of circumstances that are essentially driving the CAT claim. Um, it is, it's going to be what happens when they return. Um, and so as much as there is a default when they, there is an argument that they arise from the same circumstances, the underlying circumstances may have arisen, but what's the first, the facts that are relevant for the future events are not the same. They're not entirely the same. So the relying wholeheartedly on the credibility duration is actually, um, somewhat a faulty approach. It has to be independently assessed in that regard. I will speak to the one, something that keeps coming up though. Um, the court's attention should really look at exhibit, what's marked as Exhibit 3 in the record. And it's in the administrative record, it's page 3, 3, 2, 6, 2, and 3, 7, 5, 6. Those are the asylum officer assessments. Um, the individuals did appear for an interview and detailed the additional facts that the immigration judge and the agency say were missing. They were in the government's record at the time of the hearing. There was no element of surprise or an evolution of a claim. They had testified before the asylum office and the asylum officer found them credible on those details and their explanation for why they were adding them at the interview in a one-on-one explanation. And so as that's the driving force of the starting point, the linchpin for the credibility analysis, they're not acknowledging the very exhibit that government provided at the beginning of the case. Exhibit 3, it's right there in the asylum officer's commentaries there, including the relevant additional identifier of actors and identifying the volume, all those things. And so if that's the starting point of the credibility analysis, then the government's argument fits. And with that, your honor, I do respect that you have gone over my time and I appreciate your time today. Thank you. Very well. Thank you for your argument. The case is submitted and the court will file a decision in due course.